# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

|                                                    |     |                                          |
| -------------------------------------------------- | --- | ---------------------------------------- |
|                                                    | )   |                                          |
| **BARBARA J. CRAWFORD**                            | )   | Civil Action No. 5:13cv00049             |
|                                                    | )   |                                          |
| *Plaintiff,*                                       | )   | REPORT AND                               |
| v.                                                 | )   | RECOMMENDATION                           |
|                                                    | )   |                                          |
| **CAROLYN COLVIN**                                 | )   | By:   Hon. James G. Welsh                |
| Commissioner of Social Security,                   | )   | U. S. Magistrate Judge                   |
|                                                    | )   |                                          |
| *Defendant.*                                       | )   |                                          |
|                                                    | )   |                                          |

The plaintiff, Barbara J. Crawford, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ("the agency") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, as amended, 42 U.S.C. §§ 1381–1383f, and her claim for disability insurance benefits ("DIB") under Title II, 42 U.S.C. §§ 461(i) and 423. This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

## I.    *Administrative and Procedural History*

Forty-seven years of age at the time of her alleged onset, the plaintiff filed for disability and supplemental social security income in April 2008 (R. 335-342). Therein, she claimed an onset date of April 20, 2009[1](R. 49). Her claims were initially denied (at two separate initial determinations) (R. 106-07, 155-71); they were denied again on reconsideration (R.108-121), and they were denied a third time by written decision of an administrative law judge ("ALJ") dated May 27, 2010 (R. 141-149). The Appeals Council subsequently remanded the matter for

---

[1] Plaintiff initially claimed an onset date of February 15, 2008 (R. 335). This was subsequently amended (R. 49).

further analysis of the treating source opinion of Dr. Michael Marsh and for further discussion of Ms. Crawford's residual functional capacity with specific evidentiary references (R. 193-194).

Following this remand and a supplemental hearing, the ALJ again denied Ms. Crawford's claims (R. 21-35). In her written decision the ALJ found the plaintiff met the Act's insured status requirements through June 30, 2013 (R. 22) and had not engaged in substantial gainful activity[2] since her alleged onset date (R.23). She determined the plaintiff suffered from several severe impairments including: degenerative disc disease, obesity, fibromyalgia,[3] chronic fatigue syndrome,[4] rotator cuff tendonitis,[5] an anxiety disorder, and a depressive disorder (R. 24). These ailments were deemed severe because they "limit[ed] the [plaintiff's] ability to perform heavy lifting, unlimited postural activities, unlimited reaching and complex/detailed tasks" (R. 24). Plaintiff's claim of urinary incontinence was deemed by the ALJ to be non-severe, because it had been responsive to treatment and created no long-term exertional limitations (R. 24). Similarly, the ALJ noted that the plaintiff's diabetes and restless leg syndrome[6] had both responded to basic treatment and medication and, therefore, were also non-severe (R. 24). Evaluating each

---

[2]    Substantial Gainful Activity ("SGA") is work for pay or profit that brings in over a certain dollar amount per month. 20 C.F.R. § 404.1572. For example, in 2010 that amount was $1,000, and in 2000 it was $700; income over this monthly amount (net of impairment-related work expenses) is ordinarily considered to be engaging in SGA, and the amount generally changes annually along with changes in the national average wage indexing series. *See* 20 C.F.R. § 404.1574.

[3]    Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." DORLAND'S ILLUSTRATIVE MEDICAL DICTIONARY 703 (32nd ed. 2012).

[4]    Chronic fatigue syndrome is "persistent debilitating fatigue lasting longer than six months, with other known medical conditions having been ruled out by clinical diagnosis, accompanied by at least four of the following: significantly impaired short-term memory or concentration, muscle weakness, pain in multiple joints without swelling or redness, sore throat, tender lymph nodes, headaches, unrefreshing sleep, and malaise that lasts more than 24 hours following exertion." *Id.* at 1825.

[5]    Rotator cuff tendonitis is "an overuse injury consisting of inflammation of tendons of one or more of the muscles forming the rotator cuff." *Id.* at 1881.

[6]    Restless leg syndrome is "unpleasant deep discomfort including paresthesias inside the calves when sitting or lying down, especially just before sleep, producing an irresistible urge to move the legs . . . ." *Id.* at 1846.

impairment, as well as their combined effects, the ALJ next determined that none of plaintiff's impairments met or equaled a listed impairment[7] (R.24). Continuing to follow the sequential analysis mandated by the Agency,[8] the ALJ next assessed the functional limitations caused by Ms. Crawford's impairments. In doing so, he discussed the medical evidence, the plaintiff's testimony, a third-party report from the plaintiff's sister, the medical witness testimony, and the supplemental testimony of the vocational witness (R.26-33). In reaching the additional conclusion that the plaintiff had overstated her symptoms, he noted that both examination and diagnostic testing had produced only minimal findings; he noted that Ms. Crawford had been found neurologically intact, to possess full muscle strength, to have full range of motion (R. 32), and (despite reporting multiple "tender points"" he noted the fact that the plaintiff exhibited "no significant sensory deficits on examination" (R. 32) and had a normal gait without evidence of any neuropathy (R. 32).

He ascribed great weight to the testimony of the medical witness, Dr. Haddon C. Alexander, and assigned minimal weight to the opinion of Dr. Don Martin, noting that "[Dr. Martin's] opinion appeared to be based on the [plaintiff's] subjective complaints and was inconsistent with his findings on examination, including the findings in his own treatment notes" (R.33). The ALJ also accorded minimal weight to the opinions of Drs. Michael Marsh and Daniel Chehebar for similar reasons (R. 33-34), noting in addition that Dr. Marsh's "opinions

---

[7]    The Listing of impairments is appendix 1 of subpart P of 20 C.F.R. pt. 404. The appendix details impairments the agency considers severe enough to prevent gainful activity, regardless of an individual's age, education, or work experience. 20 C.F.R. § 404.1525.

[8]    By regulation the statutory definition of "disability" is reduced to five sequential questions. An examiner must consider: whether the claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment which equals an illness contained in the Social Security Administration's Listings of impairments found at 20 C.F.R. Part 4, Subpt. P, Appx. 1; (4) has an impairment which prevents the claimant from performing past relevant work; and (5) has an impairment which prevents the claimant from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

were inconsistent with his clinical findings and diagnostic test results and that Dr. Chehebar's opinion was "conclusory" (R. 34).

Given these evidentiary findings, the ALJ then determined that Ms. Crawford was capable of "simple, unskilled, light work … except that she cannot crawl and climb ladders/ropes and scaffolds; be exposed to unprotected heights, heavy machinery and rapidly moving parts; perform reaching above shoulder level; and perform more than occasional reaching to shoulder level with a weight limit of ten pounds occasionally and five pounds frequently" (R. 26). This residual functional capacity, the ALJ found, included the plaintiff's past relevant work as a cashier and as a fast-food worker (R. 34).

The appeals council subsequently denied the plaintiff's request for review, and the ALJ's written decision now stands as the final opinion of the Commissioner (R. 1). The plaintiff, thereafter, timely filed her request for court review. Both parties have filed motions for summary judgment and supporting memoranda(docket ##13, 14, 18, 19). Oral argument on these motions occurred by telephone on February 27, 2014. Along with her Answer (docket #4) to the plaintiff's Complaint (docket #1), the Commission filed a certified copy of the Administrative Record ("R." docket #10), which includes the evidentiary basis for the Commissioner's findings. By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.    *Issues Presented on Appeal*

Two issues are presented on appeal. Ms. Crawford argues first that the ALJ's findings are unsupported by substantial evidence as a matter of law and second that the ALJ erred by failing to accord adequate weight to the opinions of certain treating physicians.

### III.    Summary Recommendation

Based on a thorough review of the administrative record, and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**, that the Commissioner's motion for summary judgment be **GRANTED**, that final judgment be entered **AFFIRMING** the Commissioner's decision denying benefits, and that this matter be **DISMISSED** from the court's active docket.

### IV.    Standard of Review

The court's review in this case is limited to determining whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to DIB or SSI.  "Under the … Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard."  *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Mastro*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]."  *Id*. (quoting *Craig v. Chater*, 76 F.3d at 589).  This standard of review is more deferential than *de novo*.  The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review.  *See Island Creek Coal Company v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

### V.    Facts

#### A.  Age, Educational, and Vocational Profile

Ms. Crawford first filed for disability on April 14, 2008 based on a number of medical problems, including: multiple sclerosis, depression, back pain, fatigue and numbness in legs (R. 335-341). She claimed an onset date of February 15, 2008 (R. 335), but noted that she had become unable to work due to her disability as of October 2, 2007 (R.339). At the time of her application she was working at Domino's Pizza and collecting $600 monthly (R. 337). She possesses a high school education (R. 369) and completed some specialized computer training (R. 369).

### B. Medical RecordOverview

Ms. Crawford's medical odyssey began in February 2008. Doctors, searching for an explanation for her described pain, fatigue, and weakness, began a battery of testing at the recommendation of Dr. Daniel Chehebar (R. 573, 577-758). When MRIs (R. 559-60), blood-work (R. 565-571) and specialist reviews (R. 561-562, 563-564, 639-643) revealed that neither Multiple-Sclerosis nor Lyme disease were plaguing Ms. Crawford, her doctors decided "the most encompassing possible diagnoses would be fibromyalgia [or] chronic fatigue syndrome with additional other diagnoses" (R. 643). Though this entry appears in a July 8, 2008 report, no trigger-pointtesting appears to have been done until August 26, 2009, more than one year later (R. 1021-1022), when Dr. Chehebar noted that the plaintiff's ailment appeared "most likely [to be] fibromyalgia" (R. 998).

During the ensuing years, her doctors made multiple attempts to adjust Ms. Crawford's medication regime (R. 1108, 1123, 1127, 1162), in an effort to alleviate her complaints of the pains, fatigue andmalaise (R. 1014, 1102, 1105, 1405, 1411, 1474). This lack of success prompted Dr. Dan Martin to suggest at one point that "[g]iven the absence of any significant

benefit with 'centrally-acting' agents, [he] would focus on the core interventions of aerobic exercise and improving her sleep" (R. 1022).

Ms. Crawford, however, failed to take advantage of the benefits of exercise, even though her doctors continued to discuss "the benefit of re-starting an aerobic exercise regime" (R. 1474, *see also* R. 1019). Despite the advice and assistance of her doctors, in August 2009 Ms. Crawford continued to report pain. Her tender points at the time were "pan-positive, with the exception of her anterior neck and lateral elbow epicondyles" (R. 1021-22). In January 2010 she was "tender to the touch on her shoulder, arms, knees and thighs" (R. 1033). One year later she reported 18 of 18 tender points (R. 1264). In April she reported 13 of 18 (R. 1256), and on August 2011 she reported only 6 of 18 tender points (R. 1467-69). Despite the absence of any later tender point assessment, in February 2012 Dr. Chehebar nevertheless reported that Ms. Crawford was "[s]till with continued pain, require[ing] large doses of narcotic pain medicine" (R. 1474).

Ms. Crawford also complained of persistent pain in her shoulders—the right stemming from injury and the left which "began insidiously, [in] Feb 2011" (R. 1175). Medication and rehabilitative physical therapy were both suggested for these presumably rotator cuff issues (*See e.g.* R. 1184). The treatment record, however, charts a course of "inconsistent attendance" (R. 1071) at these appointments, and she was discharged by RMH Rehab Services in March 2011 "due to greater than thirty days since last attended appointment" (R. 1204). Her physical therapy for this period also document the plaintiff's attendance at only twenty-two therapy sessions (R. 1200-01, 1175, 1173, 1178, 1582, 1581, 1579, 1578, 1577, 1571, 1570, 1569, 1568, 1567, 1563, 1562, 1561, 1553, 1554, 1550, 1549, 1543), with multiple cancellations mostly in early 2012(R. 1580, 1566, 1565, 1564 1560, 1550). Though Ms. Crawford complained that this "physical

therapy made her too tired" (R. 1512), one therapist noted, "[t]he client tolerated today's treatment/therapeutic activity without complaints of pain or difficulty." (R. 1182), and another noted "patient reported 10/10 pain level upon arrival, but participated in her program without difficulty [and … smiled at times during her session" (R. 1179-1180).

In addition to treatment for the usual transient medical issues, including coughs and colds (*see, e.g.*, R. 1528-1531, 1131-1134, 1135-1140), Ms. Crawford was also seen at various times for her diabetic condition. Though her sugars were occasionally higher, once when she was ill with an ear-ache (R. 1148) and twice when she complained of severe stress (R. 1158, 1193), her diabetes was generally well-controlled. Blood tests throughout the relevant period show good glucose levels. For example, in March of 2011 Dr. Marsh wrote "glucose is under great control!!!"(R. 1367), and in November 2011 he wrote "your sugars are in good control, [and] [y]our lab is generally very good" (R. 1405).

Ms. Crawford complaint of stress-based incontinence was resolved with surgery (R. 1231-42). Her complaints of recurring depression and anxiety since her early teens (R.749-751, 830, 827. 823, 822, 818, 819) carried a diagnosis of Major Depressive Disorder, recurrent, Alcohol Dependence, rule-out Panic Disorder, Somatoform Disorder, PTSD and Bipolar Disorder. When she was seen at the Rockingham Community Services Board on October 15, 2008, shortly after her alleged onset date (R. 669), her medication regime at that time included an anti-depressant (Lexapro), a neuropathic pain reliever (Neurontin) and Trazodone for treatment of anxiety and insomnia (*Id.*). A mental health examination in November 2008 added type two bipolar disorder to the plaintiff's diagnosis; she was advised to continue counseling, and it was suggested that Tegertol be added to her medication regime for treatment of her nerve pain and bipolar condition (R. 667-668).

Two and one-half years later, in April 2011 Ms. Crawford once again sought treatment for a potential mental-health issue. On this occasion she presenting at the emergency room following a fainting episode, and doctors ordered a mental-health screening to rule-out a suicide attempt(R. 1061-65). The finding on this issue was negative; however, she was deemed to be anxious, depressed and to have had "suicidal thoughts but no plan of action" (R. 1158, 1061-1065).

### 1. Dr. Martin

Dr. Martin, a rheumatologist at Rockingham Memorial Hospital treated the plaintiff for the first time during the summer 2009. At the time he noted that the plaintiff's "[t]ender points remain pan-positive, with the exception of her anterior neck and lateral elbow epicondyles (R. 1021-1022, 1075).

When the plaintiff next saw Dr. Martin in November, he noted that she had begun a therapeutic trial of a different medication regime, that her trigger points remained "pan positive," that she had failed to initiate any regular aerobic exercise program, and that there was "no support in the literature whatsoever" for her use of narcotics as a treatment modality (R. 1018-1019.

Fourteen months later, when the plaintiff next saw Dr. Martin, she reported that her shoulder pain was worsening and that light pressure at all eighteen trigger points produced pain (R. 1264). Follow-up radiographic studies, however, demonstrated no rotator cuff tear and only "mild" osteoarthric changes in the plaintiff's right shoulder (R. 1215, 1220). When Dr. Martin next evaluated the plaintiff's fibromyalgia on April 28, 2011, he found no sensory loss, no loss of motor function, no problem with either balance or gate, and tenderness in only 13 of the 18

trigger points (R. 1254-1260).  In his opinion, "her shoulder symptoms do not correlate with her exam" (R. 1257).

Patently inconsistent with these findings, two days later Dr. Martin provided questionnaire responses to Ms. Crawford's attorney in which he opined that the plaintiff's rotator cuff tendonitis and fibromyalgia were "incapable of even low stress jobs" (R. 1076).  Without undertaking any functional testing or assessment, he further opined that as of October 2007 (two years before he first saw her), the plaintiff could sit for only one hour, stand only one-half an hour, would need a five to ten minute break every one-half hour or hour, could lift less than ten pounds, and had handling, fingering and reaching limitationsthat were only twenty-five percent of normal (R. 1075-79).

Without any further treatment or assessment of the plaintiff's condition, Dr. Martin in August filed-out a second questionnaire, wherein he reported that the plaintiff was experiencing "pain in both hips and down back of thighs, also separate pain noted below the knees that is particularly problematic for her … [and] pain from fibromyalgia has been acting up due to [w]orking a lot"(R. 1405-1411).  He provided no explanation for this opinion, and he did not elaborate on what work Ms. Crawford was performing at the time.

Two weeks later Dr. Martin saw Ms. Crawford for a follow-up office visit.  He recorded a 5/10 pain score and 6 of 18 tender points (R. 1467-69).  He did not see her again until February 17, 2012, when he noted Ms. Crawford was under a "great deal of stress" (R. 1479), and that he had "discussed [with her the] potential benefit of re-starting an aerobic exercise regime" (R. 1480).

### 2. Dr. Marsh

Dr. Marsh first appears in the record in July 2009, although it appears from this appointment note that Ms. Crawford had previously been a patient. (R.1015-16). As the plaintiff's primary care provider, he prescribed and adjusted her medications (*see, e.g.*, 1015, 1010, 1037, 1108, 1123, 1127, 1162, 1393, 1489,1498, 1504, 1522), fielded her complaints of pain, restless muscles, and fatigue (R. 1014, 1037,1102, 1116, 1141, 1413, 1416), counseled her on stress, diet, and exercise (R. 1157, 1393, 1182, 1404), and helped to manage her diabetes. (R. 1092, 1094, 1122, 1367, 1148, 1157, 1393, 1540). Though he notes the plaintiff's "[f]ibromyalgia and chronic fatigue diagnos[es] in 2007" (R. 1002), he performed no independent testing or functional assessment. His care of Ms. Crawford can be fairly summarized as totally routine and conservative, and his physical therapy recommendation was ignored by the plaintiff (R. 1184).

Nevertheless, Dr. Marsh completed three separate questionnaires for submission to the agency. In the first, dated March 2, 2010 he opined that Ms. Crawford could lift ten pounds occasionally and five pounds frequently, could stand or walk two hours (half an hour without interruption), could sit six hours daily but only thirty minutes without interruption, and could not climb, balance, or crawl. He noted her limited ability to reach overhead, "poor balance and slowed reaction time." He also predicted Ms. Crawford would miss twelve to fifteen days of work every month, though he believed she could perform sedentary work, despite her "constant psychological stress" (R. 1040-45).

In his second and third questionnaire responses, both dated April 13, 2011, he explained that his functional capacity opinion was based on "pain to palpitation in neck, back, shoulder, knees and chest" (R. 1051). Although he also confirmed Ms. Crawford's capability to perform some form of low-stress work, his updated opinion of her residual functional capacity declined.

He posited that Ms. Crawford could sit only one hour, stand only forty-five minutes, and would need to walk five minutes of every forty-five. In his opinion, she would need unscheduled breaks every one to two hours for five to ten minutes and also had a forty percent functional limitation in the use of her hands, a sixty percent limitation in the use of her fingers, and a forty percent limitation in her ability to reach (R. 1046-1050, 1051-55).

### 3. Dr. Chehebar

In his capacity as a neurologist at Rockingham Memorial Hospital, Dr. Chehebar first saw Ms. Crawford on February 12, 2008 at the request of a staff nurse (R. 573, 577-79). Troubled by Ms. Crawford's reported symptoms, which included "memory loss, confusion, depression, insomnia, occasional abdominal and stomach discomfort related to ulcers … [and] difficulty with ambulation" (R. 577), the doctor ordered a battery of MRI and other tests and referred Ms. Crawford for special testing at the University of Virginia to rule-out multiple sclerosis (R. 559. 560, 565-71, 561-62, 563-64). He subsequently spoke with Ms. Crawford in April 2008 about her reported back pain, noting at the time it was "significant and limit[ed] her ability to work" (R. 583), and that "in [his] professional opinion [the plaintiff] require[d] skilled rehabilitative therapy in conjunction with a home exercise program to address the problems … [but the] overall rehabilitation potential [was] good" (R. 616). His diagnosis was "lumbago" with a limited range of lower back motion (R. 612-15).

Seven months later, in November 2008 Ms. Crawford returned with "essentially unchanged symptoms" (R. 675). Dr. Chehebar concluded "overall … her symptoms [were] more consistent with fibromyalgia [than any other available diagnoses]" and prescribed Lyrica as a pain reliever (R. 676). In an office note later the same month, He repeated these same equivocal diagnoses saying, "I do not see any other clear neurologic diagnosis that would explain all of her

symptoms." (R. 922). At a follow-up office visit in February 2009, Dr. Chehebar noted that since her previous appointment in January the plaintiff "ha[d] actually had significant relief of left upper extremity weakness and paresthesia" (R. 915) and that his "limited physical examination reveal[ed] intact muscle tone and bulk [and] 5/5 upper extremity strength on the left and right" (R. 915).

After Ms. Crawford's amended onset date, Dr. Chehebar saw her only three times.[9] In August 2009he repeated his feeling that Ms. Crawford "most likely" suffered from fibromyalgia (R. 998). In January 2012 he records the result of a "normal" electrodiagnostic study (R. 1485-1487), and in February he recorded that the plaintiff was "still with continued pain [and] requires large doses of narcotic pain medicine" (R. 1474).

#### 4. State Agency Medical Evaluations

During the state agency's 2009 reconsideration of Ms. Crawford's claims, her records were separately reviewed by Dr. William Amos, MD, and Nicole Sampson, PhD, , and each found her condition not to be of disabling severity (R. 108-121, 122-135). No disabling mental impairment was identified. It was noted that Ms.Crawford was not receiving any treatment for her alleged depression, and that she was performing household chores and caring for her two sons successfully (R. 114, 128). Regarding her description of her physical limitations, they found her partially credible and observed that her reports of pain were not "substantiated by the objective medial evidence alone" (R. 116, 128). Although her pain was deemed to be somewhat limiting, it was concluded that the medical evidence showed improvement with medication, despite Ms. Crawford to properly follow her medication regime (R. 116, 128). It was also

---

[9]    All told, Ms. Crawford saw Dr. Chehebar fourteen times, but only three were after her alleged onset date.

remarked that "[t]he evidence shows no significant muscle weakness or loss of control . . . although [there is] pain, it does not limit [the] ability to stand, walk and move about within normal limits" (R. 121, 135).

Two years later a similar assessment was performed by Sandra Francis, Psy.D and R.S. Kadian, MD, (R. 155-171, 172-188).   Dated July 18, 2011, these two state agency reviews concluded that the plaintiff's symptoms and conditions had remained "relatively stable, and although they agreed claimant's spine disorder, fibromyalgia, joint dysfunction, affective and anxiety disorders were all severe, they also concluded Ms. Crawford's condition was not of listing-level severity (R. 163-164, 180-181).   Once again Ms. Crawford was found to be only partially credible, and it was remarked that "the intensity of [the claimed] symptoms [was] not entirely credible as [Ms. Crawford was] able to prepare simple meals, do light household chores, drive, ride in a car and shop.   It was also noted that she "report[ed] no issues with memory, concentration, and completing tasks" and that [h]ercompliance with treatment is also questionable" (R. 165, 182). They also limited weight to Dr. Marsh's opinion, because it was "not consistent with the current evidence" (R. 165, 182), and as the ALJ later concluded these reviewers also found Ms. Crawford capable of light work (R. 165, 182).

### C.  *Testimony and Third Party Evidence*

#### 1.  *Ms. Barbara Crawford (Plaintiff)*

In her 2008pain and fatigue questionnaires Ms. Crawford detailed her low-back pain, and she described spasms in her back and up and down her limbs in the mornings (R. 410).  She also noted sensitivity in the top of her head (R. 410), and she listed several medications prescribed by Dr. Chehebar, including: Baclofen for her muscle spasms, amantadine (an anti-viral), and

Darvocet (an analgesic). She reported that these medications helped with her pain, but made her sleepy and distorted her powers of concentration (R. 411). Although she reported that even on her most difficult days she was able to care for her sons and get them to school (R. 413), she stated she had difficulty walking more than one-eighth of a mile without having to rest for fifteen minutes (R. 422).

In her responses to a questionnaire three years later, she also reported experiencing forgetfulness (including a tendency "to forget what medicines [she had] taken)" (R. 440), increased pain, and a plethora of medications, all prescribed by Dr. Marsh, including: Nexium, Lexapro, Mirapex, Actos, Simvastatin, Pepcid, Lantus, Fiorcet, Demerol, and Flexril (R. 511).

During her 2012 administrative hearing, Ms. Crawford described her past work as a pizza-maker and deliverer, a pharmacy cashier, a box-bander, and a shipping worker (R. 74-76). She stated that she has "a lot of anxiety and panic attacks because I get very stressed and I get very tired as soon as I get up" (R. 77). She reported six hours of sleep or less a night (R. 78}, and one or two naps daily due to chronic fatigue and pain (R. 78). She described her days as plagued by panic attacks stemming from any unusual situation or new place (R. 80). Functionally, she stated could neither stand nor walk for six hours during a day; she could neither stand nor sit for longer than one-half to one hour; she could lift no more than ten pounds, and could not reach overhead successfully (R. 94-95).

This testimony was generally consistent with her 2010 testimony (R. 46-61). In 2010, however, it is noteworthy that she reported her use of oxycodone in addition to the other prescribed medications (R. 59).

### 2. Ms. Rachel C. Jackson (Plaintiff's Sister)

Ms. Crawford's sister, Ms. Rachel C. Jackson, completed a Function Report on her behalf (R. 388-398), in which she described a typical day for Ms. Crawford included: "takes children to school, cooks meals for them, naps or rests a lot, tries to work at general household chores to keep the house picked up, [and] [o]ccasionally works outside the home as a pizza delivery person" (R. 389). Ms. Jackson described her sister as "worn out" by even light housework in the wake of her disability, and as having to struggle to play outside with her children (R. 390). Ms. Jackson also remarked on what she perceived to be an "overall decline" in her sister's personal care (R. 390), described her as 'withdrawn,' but said she was able to call and textothers for up- to five hours each day and attended church occasionally (R. 394).

### 3. Dr. Hayden Alexander (Medical Witness)

Called as an independent medical witness, Dr. Hayden Alexander stated that he had reviewed the medical evidence (R. 69). He identified Ms. Crawford's diagnosed ailments, including: chronic pain syndrome, fibromyalgia, gastroesophageal reflux, gastritis, cervical spine disease, diabetes mellitus (with no radiculopathy), a shoulder issue, restless leg syndrome, an ovarian cyst, plantar fasciitis, and past acute bronchitis (R. 83-84). In his summarization of these conditions, he remarked that "the principal problem, of course, is the pain syndrome, and coupled with the--- what I found in this record having diagnosed and treated ---severe depression and bipolar [disorder]" (R. 84). These diagnoses, he stated, started with "a workup for multiple sclerosis and for a number of different symptomatologies," and he observed that after testing demonstrated Ms. Crawford did not have multiple sclerosis, Dr. Chehebar diagnosed her condition as fibromyalgia (R. 82-83).

After acknowledging Ms. Crawford's pain and her mental health problems were significant and would warrant referral to a specialist (particularly in light of the connection

between stress and fibromyalgia flare-ups) (R. 86-87), Dr. Alexander expressed his professional opinion that Ms. Crawford's ailments were not of listing-level severity (R. 84).  Underscoring the basis for this opinion, Dr. Alexander pointed-out that the "principal objective finding" pertained to the plaintiff's shoulder issues, which would functionally limit only her ability to lift (R. 84).  He also stated that in his opinion he had not factored-in the plaintiff's subjective testimony of pain and fatigue, because he did not find her complaints credible in light of the medical record (R. 87-88), and additionally he noted that if he had found "her pain credible and supported by the medical evidence of record, there would be no jobs she could perform" (R. 88).  He also took issue with the opinion of Dr. Martin and gave it little if any weight in making his functional assessment, because Dr. Martin "[did not] explain" why he assigned Ms. Crawford disabling limitations in the "absence of objective evidence of actual objective weakness and inability to function except for shoulders" (R. 89).

### 4.  Ms. Bonnie Martindale (Vocational Witness)

At the hearing Ms. Bonnie Martindale provided testimony on the availability of jobs in the national economy suited to Ms. Crawford's residual functional capacity.  She described the plaintiff's past work as ranging from light to heavy and from unskilled to semi-skilled (R. 100-101).  Consistent with the opinion of the vocational witness at the earlier ALJ hearing (R. 61-63), Ms. Martindale opined that if Ms. Crawford "were limited to simple, repetitive work at the light level" of exertion, her past work as a cashier would be exertionally open to her (R. 102).  If, however, it was found that the plaintiff required an hourly break, continually could not concentrate, could not sit, stand, or walk for more than two hours, or hand only limited use of her hands, no jobs would be available (R. 103-104).

## VI.    *Analysis*

### A.

On appeal the plaintiff's principle argument is that the ALJ was decisionally obligated to give controlling weight to the treating source opinions of Drs. Marsh and Martin, and as support for this claim of error she cites *Mastro v. Apfel*, 270 F.3d171 (4th Cir. 2001), for the proposition that "[a] treating physician's opinion can only be disregarded if there exists in the record 'persuasive contradictory evidence.'"   This argument, however, misreads *Mastro.* Correctly stated *Mastro* stands for the proposition that a treating physician's opinion "is entitled to controlling weight [only] if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro,* 270 F.3dat 178. In addition, in *Mastro* the Fourth Circuit went-on to advise that when a treating source opinion is unsupported by clinical evidence or is inconsistent with other substantial evidence the ALJ may assign such an opinion less weight. *Id.*

As to Dr. Martin's opinion in the instant case, he met with the patient only a handful of times, and when comparing his treatment records to his responses in two separate questionnaires, the only possible conclusion is that Dr. Martin based his assessment of Ms. Crawford's functional abilities solely on her statements.  For example, he reported the plaintiff as having significant function limitations in the use of her hands and fingers (R. 1075, 1405), but there is no record of ever even discussing these issues with Ms. Crawford.  Moreover, in his first questionnaire responses he specifically reported that Ms. Crawford exhibited "no sensory loss, no motor issues, [and] no issue with balance of gait" (R. 1075).  Likewise, his report of a general lack of any demonstrable benefit from pharmacologic therapy and his suggested focus of treatment on "aerobic exercise and improving her sleep" (R. 1022) do not fully comport his later

assessment of her extensive physical limitations in essentially every part of her body  (R. 1046-1050, 1075-1079).  Even more telling is the fact Dr. Martin stated in one questionnaire that his diagnoses and assessment of the plaintiff's functional limitations was accurate as of "April 2008" (R. 1049) and in another that it was accurate as of "October 2007" (R. 1075), even though Ms. Crawford did not first see him until the summer of 2009 (R. 1021) and was in fact employed until April 2009 (R. 73).

In summary, even if one assumes Dr. Martin's limited treating relationship with the plaintiff qualifies him as a treating source, his assessment of her functional capacity patently lacks support in any "medically acceptable clinical and laboratory diagnostic techniques;" and it fails to comport with his own treatment records.  It was adequately discussed by the ALJ (R.33), and he explained the basis for assigning it "minimal" decisional weight (R.31).  This conclusion, therefore, falls well within the discretion provided by *Mastro*.

In contrast to Dr. Martins limited treatment history, Dr. Marsh saw and treated Ms. Crawford on approximately fifty occasions, primarily for blood work and medication refills, during the relevant period, but also for a variety transient and chronic subjective medical complaints ranging from stress to gum problems (R. 1002-1016, 1025-1038, 1061-1065, 1092-1152, 1157-1168, 1178-1186, 1221-1232, 1254-1260, 1367, 1392-1402, 1404, 1411-1414, 1416-1420, 1467-1473, 1489-1524, 1528-1531).

Prior to his first questionnaire responses (dated March 2, 2010), Dr. Marsh had seen the plaintiff eleven times. Three of them pertained to transient ailments unrelated to her disability claim—a gum infection (R. 1032-36) and a cough (R. 1006-07).  Six of the remaining office visits were follow-up appointments focused on medication adjustments (R. 1015, 1013, 1010, 1004, 1025, 1037).  On January 14, 2010 his office note documents his finding that the plaintiff

was tender to the touch, but had an otherwise normal physical examination (R.1032) and one month later, just prior to completing his first questionnaire, he noted that she was dealing with stress related to a pending family-related issue, but once again had a generally normal physical examination with "no musculoskeletal tenderness or swelling" (R. 1026).

Despite this lack of any recorded physical limitations, in March 2010 Dr. Marsh wrote that the plaintiff was effectively unable to work and would be unable to work approximately twelve to fifteen-days each month due to her medical condition (R. 1040).

Moreover, during the ensuing year Dr. Marsh met with Ms. Crawford sixteen additional times, Once again a significant number of these office visits dealt with transient medical issues or her well-controlled and non-severe ailments (*See e.g.* R. 1092, 1094, 1098, 1102, 1108, 1113, 1123, 1127, 1131, 1135, 1148, 1367). She also continued to complain of diffuse fibromyalgic pain, which Dr. Marsh viewed as "unchanged (R. 1122).

Irrespective of his record of consistently conservative treatment and the absence of any medically significant negative change in the plaintiff's medical condition, Dr. Marsh provided her with a second functional assessment in which he opined that Ms. Crawford was even more functionally limited. Specifically, he limited her to a one-hour ability to sit, instead of two hours (R.1046, 1040); to a forty minute ability to stand, instead of two hours (R. 1046, 1040), and he added a handling, fingering and reaching limitation (R. 1046). No explanation or other justification was provided for any of these more restrictive functional limitations. Dr. Marsh referenced no testing or treatment as a justification for any change of condition or as justification for his increase in the plaintiff's limitations. He simply described her as having "pain to palpitation in neck, back, legs, shoulders, knees, [and] chest" (R. 1051), but even this clinical testing was never noted in his treatment records.

Once again, given this conservative longitudinal record of treatment, the limited physical findings, and the lack of any significant diagnostic or functional testing, the ALJ acted well within his decisional discretion in concluding that Dr. Marsh's opinions are also entitled to minimal weight.

In her memorandum (docket #14 pp12-14), the plaintiff also argues at length that it was error on the part of the ALJ to rely on the expert testimony provided at the hearing from a medical expert, Dr. Alexander, who had reviewed the medical record and heard her testimony at the hearing (R. 81-92). This error, she contends, results from the ALJ's reliance on testimony that in effect rejected the agency's "method for diagnosing" fibromyalgia, and she cites the court to Social Security Ruling ("SSR") 12-2p, which sets forth guidance regarding the evaluation of fibromyalgia in disability claims. [10]

To the extent this argument suggests ALJ error on the basis of his failure to apply SSR 12-2p it is without merit. SSR 12-2p was not effective until July 25, 2012, more than two and one-half months after Ms. Crawford's case became administratively final on May 4, 2012 (R. 35). Accordingly, "neither the ALJ nor the Commissioner had any obligation to comply" with what was then a non-binding agency ruling. *Hudson v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 117846. *25 (EDMich. July 8, 2013).

Equally lacking in merit is the plaintiff's reliance of SSR 12-2p to support her argument that her condition meets the Ruling's criteria for a disabling fibromyalgic condition without any supporting objective evidence (docket #14, p 12). In fact, the Ruling simply describes how the

---

[10]    SSR 12-2p, uses two sets of criteria for diagnosing fibromyalgia— the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia and the 2010 ACR Preliminary Diagnostic Criteria. "Both sets of the criteria generally require that the claimant demonstrate: (1) a history of widespread pain; (2) tender points or other manifestations of fibromyalgia symptoms; and (3) evidence that other disorders, which could cause the symptoms have been ruled out." *Lillard v. Comm'r, Soc. Sec*., 2014 U.S. Dist. LEXIS 66720, *6, n. 1 (DMd. May 14, 2014).

agency makes the determination that an individual's fibromyalgia symptoms represent a medically determinable impairment, and it specifically states that the ALJ may appropriately consider medical records, medications and other treatments, activities, the nature and frequency of efforts to obtain medical treatment, and "all other relevant evidence in the case record." *Id*.

In his hearing testimony Dr. Alexander stated that the objective evidence in the record, in his opinion, did not support Ms. Crawford's pain complaints; however, if they were determined to be credible, he acknowledged "there would be no jobs she could perform" (R. 88). Thus, quite to the contrary of the plaintiff's assertion in her brief (docket #14, p 12), Dr. Alexander never suggested that he did not recognize the fibromyalgia diagnosis in her case. What he clearly and succinctly provided was an opinion based on the objective medical evidence, and he left for the ALJ the question of whether Ms. Crawford's claims of pain were credible.

It is well-established that subjective allegations of pain are not, alone, conclusive evidence an individual is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). And it is equally well-established that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Dr. Alexander provided an opinion based on objective medical evidence. It was consistent with the record. It was reasonable. It appropriately recognized that subjective allegations of pain are not conclusive evidence of a disability. and the ALJ, therefore, was well within his decisional rights to take such objective evidence into account. *See Reedy v. Astrue*, 2009 U.S. Dist. LEXIS 39349, *6-7 (WDVa. May 8, 2009) (opinion of ME found to have appropriately "take[n] into account and accommodate[d] the claimant's subjective complaints to

the extent they [were] credible and consistent with the record as a whole"); *See also* 20 C.F.R. § 404.1527(e)(2)(iii).

## B.

Secondarily, the plaintiff contends that the ALJ's decision is unsupported by substantial evidence. Succinctly put, this argument exhibits a fundamental misunderstanding of the limited role of the federal judiciary in the administrative scheme of the Social Security Act. On appeal the plaintiff simply asserts as a conclusion that the evidence "supports a finding that the plaintiff cannot perform work on any exertional level" (docket #14, p 15); however, this argument fails either to acknowledge or to recognize that the issue before the court is "not whether the [plaintiff] is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d at 589).

Reviewing the ALJ's decision and the entire record this court is compelled to uphold the decision of the ALJ. He considered all medical opinions and testimony in exhaustive detail (R. 24-34). He provided his rationale for why he ascribed greater weight to particular opinions and testimony (R. 32-34), and the plaintiff identified no evidence that the ALJ failed to examine or consider.

Ms. Crawford's challenge to the ALJ's denial of disability benefits on the basis of a failure to ascribe sufficient weight to her testimony and the opinions of treating physicians represents a *de facto* request for the court to second-guess those determinations. Since the ALJ in evaluating disability claims "is required to make credibility determinations—and therefore sometimes must make negative determinations—about allegations of pain or other non-exertional disabilities," his credibility findings are entitled to great weight. *Hammond v.*

*Heckler*, 765 F.2$^d$424, 426 (4$^{th}$Cir. 1985)(citing *Smith v. Schweiker*, 719 F.2$^d$723, 725 n.2 (4$^{th}$Cir. 1984). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances." *Eldeco v. NLRB*, 132 F.3$^d$1007, 1011 (4$^{th}$Cir. 1997). The Commissioner, "not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his." *Thomas v. Celebrezze*, 331 F.2$^d$ 541, 543 (4$^{th}$Cir. 1964) (citation omitted).

In the instant case, the ALJ detailed lapses and deficits in her treatment recordthat lead to his conclusions (R. 32). He noted that the "findings on diagnostic testing ha[d] been minimal, that the plaintiff has been neurologically intact on repeated physical examinations, that she demonstrated full muscle strength and essentially full range of motion in her upper and lower extremities, that she had a normal gait and on examination to demonstrate no significant sensory deficits(R. 32). In response, the plaintiff points to nothing in the record that suggests this analysis was either unreasonable or that it ignored any decisionally significant part of the record.

### C.

The recommendation that the Commissioner's final decision be affirmed does not suggest that the plaintiff is totally free of pain and subjective discomfort or does not have very real and long-standing health issues. The AJS's non-disability decision, however, is supported by substantial evidence, is free of legal error and is conclusive.

## VII.  *Proposed Findings*

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. The plaintiff was 47 years of age at her alleged onset date;

2. The plaintiff has a high school education;

3. Her past relevant work includes cashier and fast-food worker;

4. The plaintiff has not engaged in significant gainful activity since her amended alleged onset date (April 20, 2009);

5. The plaintiff has following severe impairments: degenerative disc disease, obesity, fibromyalgia, chronic fatigue syndrome, rotator cuff tendonitis, an anxiety disorder, and a depressive disorder;

6. Each of the ALJ's credibility determinations is supported by substantial evidence;

7. The plaintiff has failed to meet her evidentiary burden to establish entailment to a period of DIB or to SSI through the date of the ALJ's decision;

8. All facets of the Commissioner's final decision are supported by substantial evidence;

9. The ALJ fulfilled his basic obligation to develop a full, fair and adequate record;

10. The Commissioner's final decision is free of legal error; and

11. The final decision of the Commissioner should be affirmed.

## VIII.  *Transmittal of the Record*

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## IX.    *Notice to the Parties*

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof.  **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.**  Failure to file specific objections

pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

ENTER:  This 18th day of June 2014.

s/   James G. Welsh

U. S. Magistrate Judge